**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| WILLIAM JAMES MATTHEW WALLACE, II, | Case No. 3:18-cv-1975-SI |
| Plaintiff, | **ORDER** |
| v. | |
| WASHINGTON COUNTY JAIL and NAPHCARE MEDICAL, | |
| Defendants. | |

Mark G. Passannante, BROER & PASSANNANTE, P.S., 8904 NE Hazel Dell Avenue, Vancouver, WA 98665. Of Attorneys for Plaintiff.

Christopher A. Gilmore, Sr. Assistant County Counsel, OFFICE OF WASHINGTON COUNTY COUNSEL, 155 NW First Avenue, Suite 340, MS #24, Hillsboro, OR 97124. Of Attorneys for Defendant Washington County Jail.

Jennifer K. Oetter & Ian M.R. Armstrong, LEWIS BRISBOIS BISGAARD & SMITH LLP, 888 SW Fifth Avenue, Suite 900, Portland, OR 97204. Of Attorneys for Defendant NaphCare Medical.

**Michael H. Simon, District Judge.**

Plaintiff William James Matthew Wallace, II (Wallace) sues Defendants Washington

County Jail (WCJ) and NaphCare Medical (NaphCare). Wallace, who uses a wheelchair, alleges

that WCJ failed to accommodate his disability when Wallace was an inmate at WCJ,[1] in violation of the Americans with Disabilities Act (ADA). Wallace also claims that he received medical treatment from NaphCare, a correctional healthcare provider, that was constitutionally insufficient under the Eighth Amendment of the United States Constitution.

On June 24, 2019, the Court granted in part and denied in part WCJ's motion to dismiss, leaving only Wallace's ADA claim. ECF 37. Wallace then filed an amended complaint on that claim. First Am. Compl., ECF 66.

Now before the Court are motions for summary judgment from both WCJ (ECF 99) and NaphCare (ECF 101). In his response, Wallace withdraws his claim against NaphCare and asks the Court to dismiss that claim with prejudice. ECF 124 at 1. The Court thus dismisses the claim against NaphCare and denies NaphCare's Motion for Summary Judgment as moot. For the reasons discussed below, the Court denies WCJ's Motion for Summary Judgment.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

---

[1] On March 9, 2020, Wallace filed a Notice of Change of Address indicating that he has moved to the Substance Abuse Treatment Facility and State Prison, Corcoran in Corcoran, California. ECF 58.

on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

Wallace was incarcerated in WCJ from August 5, 2018, to February 27, 2019. Wallace needs a wheelchair because of damage sustained to his ankle before his stay at WCJ. WCJ issued Wallace a wheelchair upon his arrival. The WCJ administrative grievance system has four levels of grievance review.

## A.  Wheelchair

When WCJ took custody of Wallace on August 5, 2018, Wallace hopped on one leg to board the transport bus and told the Deputy Sheriff who drove the bus that he could not walk. Passannante Decl. Ex. 1 (Wallace Dep.) 38:12-21, ECF 124-2. Upon arrival at WCJ, that sheriff obtained a wheelchair for Wallace's use while at WCJ. *Id.* 38:21-22. The Deputy Sheriff told Wallace that WCJ had not been told that Wallace required a wheelchair. *Id.* 38:22-23. Shortly thereafter, according to Wallace, Deputy Susan Breshears "verbally assault[ed]" Wallace and told him that he was able to walk, did not need a wheelchair, and was "making up" his need for one. *Id.* 38:24-39:18; *see also* Mansfield Decl. Ex. 1 (Grievances Ex.) at 7, ECF 100-1. Wallace responded that walking caused him severe pain and that he was due for surgery; Wallace also spoke to the deputy's supervisor to explain his injury. Wallace Dep. 39:3-20.

The wheelchair Wallace received when he arrived at WCJ had nonfunctional breaks and no footrests. Wallace Dep. 72:6-8. On October 10, 2018, Wallace submitted an administrative grievance concerning the adequacy of his wheelchair, raising the concern that wheelchairs

lacking these features were "unsafe and not in compliance with ADA requirements" and "subject[] my already disabled leg to the possibility of further injury." Grievances Ex. at 20-21 (Grievance #026230253). In response, on or about October 16, 2018, Wallace received a different wheelchair. Wallace appealed a day later, stating that the "new wheelchair" he had received again lacked working breaks and support for his feet. Staff then approved Wallace's request to use a personal wheelchair brought to the facility by Wallace's family. WCJ later retracted its permission, and Wallace did not receive his personal wheelchair. *See* Grievances Ex. at 24; Wallace Decl. 82:25-83:3.

On October 30, 2018, Wallace grieved the denial of his personal wheelchair, stating that WCJ had approved his personal wheelchair in his prior grievance. Grievances Ex. at 23-25 (Grievance #028068393). WCJ staff responded on October 31, 2018 that Wallace had received a "brand new wheelchair right out of the box." When Wallace appealed this grievance, staff explained that WCJ policy does not permit outside wheelchairs and WCJ had instead provided him a new wheelchair. Wallace did not contest that he had received a new wheelchair with foot supports. Wallace, however, continued to appeal, arguing that his orthopedic surgeon had approved his "personal" wheelchair. The medical director responded that Wallace's medical records merely recommended the use of a wheelchair "related to painful ambulation," not a specialty or personal wheelchair and that WCJ had retracted its prior approval of his personal wheelchair after it provided a "brand new suitable wheelchair" that had been unavailable earlier. In response to Wallace's final appeal, Undersheriff Jeff Mori wrote that WCJ had provided Wallace with "a brand new wheelchair" and advised Wallace to consult the ADA coordinator if he needed other modifications to accommodate his disability. Undersheriff Mori denied and closed the grievance.

Although he now had a new wheelchair with foot supports, Wallace continued to grieve issues related to his wheelchair. On November 14, 2018, Wallace challenged actions by WCJ staff as "blocking access to healthcare." Grievances Ex. at 31-33 (Grievance #029498183). This grievance referred to a conversation with an outside orthopedic surgeon during which Wallace asked if the surgeon would recommend the use of his personal wheelchair and WCJ staff interfered. WCJ denied this grievance, stating that the decision about the personal wheelchair had been discussed and decided in previous grievances.

According to WCJ staff reports in the grievance record, on December 17, 2018, Wallace met with WCJ's medical director to discuss a plan to discontinue Wallace's use of a wheelchair for all-day use, as recommended by his outside orthopedic physician. Grievances Ex. at 41-43. According to this record, the orthopedic surgeon recommended that Wallace do physical therapy and walk with a brace and laced-up tennis shoes instead of always using a wheelchair. Wallace disputes WCJ's interpretation of the orthopedic surgeon's advice, instead suggesting that the surgeon wanted to monitor his condition while encouraging him to get some exercise through physical therapy. *See* Wallace Decl. 41:1-25.

On January 5, 2019, WCJ took away Wallace's wheelchair, and Wallace grieved the removal of his medical equipment. Grievances Ex. at 41-44 (Grievance #034455413).[2] WCJ staff at first responded that their decision followed the recommendations of the orthopedic physician and that Wallace had access to a wheelchair for longer distances. Wallace appealed twice, maintaining that "[w]alking causes me severe pain in my leg." WCJ then agreed to return

---

[2] In his deposition, Wallace recounts that he lost the wheelchair "from somewhere in mid-November . . . through mid-to late-December. They took it from me for a month." Wallace Decl. 40:15-22. Because Wallace recounts these dates "off the top of [his] head," *id.* at 40:17-18, the Court presumes that Wallace misremembered the dates and recites the dates in the grievance record for purposes of this motion.

Wallace's wheelchair "at [Wallace's] insistence and against [his] specialist's advice." The medical director added that "[y]ou should be aware that this continuous use of the wheelchair is going to impede your recovery." By at least January 25, 2019, Wallace's wheelchair was restored for full-time use. Wallace appealed again and WCJ closed his grievance because it had granted Wallace's request.

The restored wheelchair, however, again lacked brakes and foot supports. Wallace grieved these issues on January 20, 2019, indicating that WCJ had taken away the new wheelchair provided in October and replaced it with an old wheelchair that was "not in compliance with ADA requirements." Grievances Ex. at 48-50 (Grievance #035977573). WCJ staff denied the grievance as duplicative and advised Wallace to submit a medical request form if he was having issues with his wheelchair. Wallace appealed, explaining that this grievance "may seem similar however the 'new' wheelchair that was supposedly bought for me has been taken away and once again I'm left with one that's old and not in compliance with ADA requirements." Staff again denied the grievance as a duplicate issue, and Wallace appealed.

While Wallace's appeal of this grievance was pending, Wallace submitted another grievance on January 30, 2019. Grievances Ex. at 56-58 (Grievance #037024263). This grievance reiterated Wallace's concerns that he had been "forced to rely on medical equipment that fails to meet the ADA" and challenged WCJ's retracted approval of his personal wheelchair use. Wallace noted that the new wheelchair he was issued had not been in his possession "in over a month." WCJ staff closed this grievance as a duplicate.

On February 1, 2019, Wallace fell from his wheelchair. In a new grievance reporting this fall, Wallace stated:

> Today my greatest fear came to pass when an obstruction in the
> path of my wheelchair, combined with failures to provide a ADA

> compliant wheelchair led to me being objected [sic] from my
> wheelchair, twisting both ankles (my broken left) and I struck both
> knees on the concrete. . . . Had I had feet support . . . this fall
> would have been prevented . . . . The resolution I'm seeking is to
> finally be given permission to have my own wheelchair, this is the
> least you can do.

Grievances Ex. at 59-61 (Grievance #037291293). Although WCJ staff closed this grievance for

procedural errors, they discussed the fall in internal notes, noting that Wallace had refused

medical treatment after the fall but had accepted pain medication, and that WCJ had video

footage of the incident. Also, in internal notes on Wallace's previous grievance, WCJ staff

discussed his fall and noted that they "did not see his feet get entangled" in the video footage. *Id.*

at 57. Wallace later stated that during the fall, he sprained only his injured left ankle, not both

ankles. Wallace Dep. 75:21-25. Wallace recounts that medical follow-up "looked at it and just

told me to stay off of it" until the orthopedic surgeon could evaluate his ankle. *Id.* 76:1-6.

On February 20, 2019, WCJ responded to the final appeal of Wallace's January 20, 2019

grievance about his replacement wheelchair lacking brakes and foot supports. Undersheriff Mori

reported that Wallace had been "provided a brand new ADA compliant wheelchair" that was

replaced with "another new wheelchair with foot supports" when it was discovered that the

previous wheelchair had a crack. Grievances Ex. at 48. Undersheriff Mori then denied the

grievance as moot.

In internal notes for the grievance on Wallace's fall, WCJ staff stated that on

February 13, 2019, they spoke with Wallace's mother, who had ordered him a personal

wheelchair. *Id.* at 60. WCJ agreed to store this wheelchair "to help facilitate [Wallace's]

transport back to [Washington Department of Corrections]." In an internal note on a separate

grievance, WCJ staff stated that they again spoke with Wallace's mother on February 21, 2019

about Wallace's personal wheelchair. *Id.* at 56-57. Staff confirmed that Wallace's personal

wheelchair had arrived on February 22, 2019. Although Wallace saw "several other people with

their own wheelchairs," WCJ never allowed Wallace to use his personal wheelchair within the

facility. Wallace Dep. 72:19-25, 73:18-19.

## B. Showers

WCJ placed Wallace in a disciplinary cell for a week. Wallace Dep. 87:12-14. Although

the disciplinary cell was designated as handicap-accessible, the cell lacked rails and did not have

an accessible shower. *Id.* 87:17-88:14. After completing his time in the disciplinary cell, Wallace

was relocated to another cell accessible except for the shower, which did not have support rails.

*See id.* 88:10-18.[3] Wallace asked to be moved to a cell that had a handicap-accessible shower. *Id.*

88:22-24. As a result of the inaccessible shower, Wallace could not bathe for more than a week

at a time. *Id.* 89:1-3.

Wallace grieved the issue of inaccessible showers on August 16, 2018. Grievances Ex.

at 8-9 (Grievance #021570243). Wallace described his challenges with the shower:

> It requires that I place my wheelchair outside the shower, then I've
> got to balance precariously on my 1 good leg and then somehow
> hop into a slippery wet shower in sandals. What should be the
> situation would be the ability to roll into the shower stall and
> transfer directly from my wheelchair onto the shower chair, also
> the lack of shower wand also means I'm required to stand without
> support to wash my backside.

*Id.* at 8. Wallace acknowledged that he had been given a shower seat but sought relocation. On

August 29, 2018, WCJ staff noted that Wallace "does indeed have a valid ADA claim for

wheelchair or walker and should be housed in a cell with a shower." Staff moved Wallace to an

---

[3] The timing of Wallace's week in the disciplinary cell is unclear from the evidence presented. Based on context in Wallace's deposition, and making all reasonable inferences in Wallace's favor, the Court infers that Wallace's discipline was imposed within the first month of Wallace's incarceration at WCJ, before he was relocated to another cell.

accessible cell with an accessible shower. According to staff's grievance notes, Wallace told

staff that he was satisfied with his new cell. Wallace did not appeal this grievance.

On October 31, 2018, Wallace filed another grievance for ongoing issues "regarding

failure to have access to [a] handicapped shower." Grievances Ex. at 26-28

(Grievance #028168813). In this grievance, Wallace described that his shower did not work on a

consistent basis and throughout the past week he had only been able to use it once. Wallace

stated that "in nearly 3 months I have not had consistent access to a shower." Wallace also

described that maintenance had visited his cell the day before to fix his shower but had

determined the shower was in working order upon noting the flow of water, which Wallace could

not replicate the next day. WCJ staff spoke to the maintenance worker and then closed the

grievance. Wallace appealed. On November 8, 2018, WCJ staff researched the issue, identified

functionality issues with the shower, moved Wallace to a different cell, and submitted

maintenance requests for both Wallace's original and new showers. After finding that the shower

in Wallace's original cell appeared to work, staff moved him back, but kept the work order in

place. Wallace continued to appeal, stating that he still had no shower.

Wallace submitted his final shower grievance on December 9, 2018, summarized as

"[s]hower still not working after repeated requests to have it fixed over the last 4 months."

Grievances Ex. at 36-37 (Grievance #031856113). Wallace described the inconsistent

functionality of his shower depending on the time of day: "Between the hours of 9pm and 5am

the shower doesn't work at ALL. Between the hours o[f] 5 am and noon it works maybe 50% of

the time, however several times I've been left covered in soap when the water stopped." Wallace

recounted that staff had told him that they had requested work orders, but Wallace had "little

faith" that maintenance would fix his issue. In response, WCJ staff verified the existence of a

work order for Wallace's shower. After Wallace appealed, WCJ staff verified that maintenance had completed the work order on December 20, 2018. Wallace again appealed on December 27, 2018, describing that his shower "does not work at ALL" and recounting that WCJ staff had taken him to shower at another location "because I've not [had] a shower in over a month." At the final level of appeal, on January 9, 2019, Undersheriff Mori confirmed that Wallace's shower was working properly, then denied and closed the grievance.

Wallace recounts that a WCJ staff member took him to shower at WCJ's medical facility several times after Wallace demonstrated that his shower did not work. Wallace Dep. 89:16-90:2. Wallace also wrote to the ADA coordinator, who initially responded that maintenance had fixed the issue. *Id.* 90:3-6. When Wallace pressed, the ADA coordinator investigated further, and WCJ then discovered that there had been a faulty valve behind Wallace's shower, which they replaced. *Id.* 90:8-12. Wallace's shower issue was then resolved. *See id.* 90:10-14.

## C. Transport

A few days after Wallace's arrival, on August 10, 2018, WCJ transported Wallace to a court hearing. According to Wallace,

> Deputy Gravley, who transports inmates to the courthouse, shackled me at the waist, restrained my hands and legs, and then took me to the van. Then at that point, two deputies lifted me by both arms and laid me on the filthy floor. Then unable to support myself, I was rolling around, like, on the floor. I couldn't support – or maintain my position.
>
> Deputy Gravley drove in a very unprofessional manner. He accelerated rapidly, braked heavily, and turned without slowing. I was thrown about in a dangerous manner and nearly struck my head on the sharp metal bench seat. Once at the court, they said I wasn't needed . . . So again, I rode on the floor sliding all over.
>
> When I inquired why I was transported this way, they said that is Washington County policy to transport handicapped prisoners in that manner.

Wallace Dep. 57:1-18. Although not at issue here, Wallace had injured his neck and shoulder during his initial transport to WCJ, before WCJ took custody. Wallace Dep. 35:23-36:11. Wallace alleges that the courthouse transport on August 10, 2018 aggravated his neck and shoulder injury and that he had trouble breathing the next day. *Id.* 61:1-7.

After this experience, Wallace communicated with Lieutenant Caprice Massey, who assured him that it would not happen again. *Id.* 59:25-60:4.[4] Despite this assurance, WCJ was about to repeat this method for Wallace's next transport, on September 10, 2018. *See id.* 60:4-5; Grievances Ex. at 13. Before the transport occurred, at Wallace's insistence, Deputy Gravely contacted other WCJ staff, who instructed Deputy Graves to transport Wallace in a patrol car, not a van. Grievances Ex. at 13; *see* Wallace Decl. 60:14-15, 62:2-6. According to WCJ staff, Wallace was then transported both ways seated in a patrol car without handcuffs secured. Grievances Ex. at 12-13.

Wallace filed a grievance on September 10, 2018, raising concerns that his prior transport issues were not resolved. *Id.* at 11-13 (Grievance #023651063). In an internal note on this grievance, Lieutenant Massey confirmed that she did "have a conversation with this Inmate about him not being transported on the floor of the van." Lieutenant Massey recounted that she "told him he would still be restrained but that more consideration would be taken regarding his transport." WCJ staff denied this grievance for failure to meet administrative requirements. Wallace appealed asking for a note in his record that he required special transport to avoid future issues and confrontations. Lieutenant Massey responded that the proper communications and hazards had been entered "so this transport error should not occur again" and closed the

---

[4] Wallace apparently filed a grievance regarding his first improper transport, but that grievance is not in the record. *See* Grievance Ex. 11-12 (referring to Wallace's prior grievance).

grievance. Wallace did not appeal. After that, WCJ transported Wallace by seating him in a vehicle with his wheelchair in the back so that it would be available at his destination. Wallace Decl. 60:17-19.

## D. Work Assignments

Wallace sought to join a work crew at WCJ. To be eligible for work, Wallace had to receive medical clearance. *See* Wallace Decl. 91:12-16. Wallace at first was denied medical clearance. On October 12, 2018, Wallace submitted a grievance, noting that he had been told the denial was due to his use of a wheelchair. Grievances Ex. at 22 (Grievance #026459153). WCJ staff instructed Wallace to discuss the issue with his medical provider and closed the grievance. Wallace did not appeal.

After four months, WCJ hired Wallace onto a pod cleaning crew. Wallace Dep. 91:17-20. Wallace was told to do anything he could do comfortably with his disability and that he would not have to climb stairs. *See id.* 91:17-92:1. After Wallace had been on the pod crew for about two weeks, Deputy Michael Sanchez woke Wallace in his cell and asked him to clean an upstairs cell. *Id.* 92:2-4. According to Wallace, Wallace explained that he was in a wheelchair and could not use the stairs, after which Deputy Sanchez said he needed "able-bodied workers," terminated Wallace's position, and wrote him up for insubordination. *See id.* 92:7-93:7.

On January 27, 2019, Wallace grieved this incident with Deputy Sanchez. Grievance Ex. at 51-53 (Grievance #036666023). Deputy Sanchez wrote an internal note on this grievance in which he recounted his own recollection of the incident:

> [Wallace] informed me he could not work, he told me he had a broken leg and made it clear to me he could not work in the pod at all and shrugged his shoulders. I asked him if he could wipe down windows (vestibule) when out of his cell, and he again just mentioned his broken leg . . . I told him again I was not discriminating against his disability, but that a pod worker must

also be WILLING to complete Pod tasks when asked. He did not
have to only go upstairs.

*Id.* at 52-53. WCJ staff then responded to Wallace explaining that he had been removed from

worker status because he told the deputy his leg was broken and refused to work.

Wallace appealed. In an internal note, Lieutenant Massey noted that she had determined

that there was no discrimination but would close the grievance for failure to follow grievance

procedures. *Id.* at 52. After the grievance was administratively closed, Wallace appealed again at

the third level on February 16, 2019. The grievance was reopened due to the appeal, with a

"facility deadline" noted of February 23, 2023. *Id.* at 51. WCJ did not respond by the facility

deadline. Wallace was transferred out of WCJ on February 27, 2019. Mansfield Decl. Ex. 3 at 1,

ECF 100-3.

## DISCUSSION

Wallace alleges the following four counts of discrimination in his ADA claim against

WCJ: (1) denial of access to an adequate wheelchair; (2) denial of access to handicap-accessible

cells and showers; (3) denial of transport in a van equipped for accessibility; and (4) denial of

accessible work assignments that did not require him to use stairs. On the first three counts, WCJ

argues that the accommodations provided were reasonable, or in the alternative, that WCJ did not

act with deliberate indifference. Regarding deliberate indifference, WCJ argues that it was not

deliberately indifferent to Wallace's requests because WCJ staff considered his requests, as

reflected in the grievance records. Wallace responds that the issues of reasonableness and

deliberate indifference require resolution of disputed facts by a jury.

On Wallace's fourth count, WCJ argues that Wallace failed to exhaust administrative

remedies under the Prison Litigation Reform Act (PLRA) and that its accommodation was

reasonable. Wallace argues that he exhausted his grievance because WCJ failed to respond and WCJ failed to accommodate him.

## A.  Arguments on Counts One through Three

### 1.  Standards for ADA Discrimination

Title II of the ADA provides:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Title II covers discrimination against inmates in state or local prisons. *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). The implementing regulations for § 12132 explain that discrimination based on disability includes instances when a prisoner with a disability is "denied the benefits of, the services, programs, or activities of a public entity" because the prison's facilities are "inaccessible to or unusable by individuals with disabilities." 28 C.F.R. § 35.152(b)(1) (2011).

To prevail on an ADA claim under Title II, a plaintiff must show that: "(1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017) (quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as am. on denial of reh'g* (Oct. 11, 2001)).

### 2.  Standards for Reasonable Accommodation

A public entity may be liable for damages under Title II of the ADA "if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to

disabled persons." *Updike*, 870 F.3d at 951. "The failure to provide reasonable accommodation can constitute discrimination." *Id.* (quotation marks omitted). "A public entity may not disregard the plight and distress of a disabled individual." *Id.*

"The question whether a particular accommodation is reasonable 'depends on the individual circumstances of each case' and 'requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards.'" *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (quoting *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999)). In other words, the public entity "is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation." *Duvall*, 260 F.3d at 1139. "It is well-settled that Title II . . . create[s] a duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are necessary" and to "consider the particular individual's need when conducting its investigation." *Updike*, 870 F.3d at 954 (quotation marks and citations omitted).

### 3. Standards for Deliberate Indifference

A plaintiff must prove discriminatory intent to recover monetary damages under Title II of the ADA. *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998), *as amended* (Oct. 8, 1998). To show intentional discrimination, the Ninth Circuit requires that the plaintiff establish that a defendant acted with "deliberate indifference." *Updike*, 870 F.3d at 950. Deliberate indifference requires both (1) "knowledge that a harm to a federally protected right is substantially likely," and (2) "a failure to act upon that likelihood." *Id.* at 950-51 (alteration omitted) (quoting *Duvall*, 260 F.3d at 1139). "When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the

plaintiff has satisfied the first element of the deliberate indifference test." *Id.* at 951. After a public entity is on notice that an accommodation is required, failure to investigate what accommodation might be reasonable may constitute deliberate indifference. *Id.* at 954. ("A denial of a request without investigation is sufficient to survive summary judgment on the question of deliberate indifference.").

"[D]eliberate indifference does not occur where a duty to act may simply have been overlooked" or where an event could be "attributable to bureaucratic slippage that constitutes negligence rather than deliberate action or inaction." *Duvall*, 260 F.3d at 1139. "Rather, in order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness." *Id.*

### 4.  Analysis

WCJ does not dispute that Wallace is a qualified individual with a disability entitled to the benefit of services from a public entity. Nor does WCJ dispute that it was on notice that Wallace required accommodation related to his wheelchair. Also, for Wallace's first three counts, WCJ does not dispute that Wallace properly grieved his accommodation concerns.[5] Rather, WCJ contends that it provided reasonable accommodation and, if not, the failure did not result from deliberate indifference.

---

[5] WCJ raised new arguments for the first time in its reply brief that Wallace must show that he properly grieved his claims. The Court disregards these newly raised exhaustion arguments. *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (noting that "arguments raised for the first time in a reply brief are waived"); *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). This argument also misstates the law of exhaustion under the PLRA. Failure to exhaust under the PLRA is "an affirmative defense the defendant must plead and prove." *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007). Thus, for Wallace's first three counts, the Court considers the grievance records as relevant only to show whether WCJ was on notice that Wallace requested specific accommodations.

### a. Count One: Wheelchair

Wallace's first count alleges that he was not provided a wheelchair equipped to meet his disability needs. As for his first wheelchair, Wallace specifically found fault with the lack of foot supports and functional brakes, which he deemed necessary for his safety. The grievance history demonstrates that Wallace's preferred accommodation was to use his personal wheelchair. WCJ initially approved Wallace's request to use his personal wheelchair on October 10, 2018, but later rescinded that approval. Wallace was never permitted to use his personal wheelchair while he was in the custody of WCJ. Instead, on October 31, 2018, WCJ provided Wallace with a brand-new wheelchair that included foot supports. If that were the end of the matter, the Court would grant summary judgment in favor of WCJ on Wallace's first claim because Wallace would be unable to show that a new wheelchair with foot supports was not a reasonable accommodation. *See Duvall*, 260 F.3d at 1137 ("To prevail under the ADA, [the plaintiff] must show that the accommodations offered by the County were not reasonable . . . .").

That, however, is not the end of the story. WCJ took away Wallace's new wheelchair on January 2nd and replaced it on or about January 24th with a wheelchair that did not have foot supports or functional brakes. Wallace submitted two grievances—first on January 20, 2019, and then again on January 30, 2019—describing the issues with his replacement wheelchair. Both were denied as duplicates of his October grievance and closed without investigation. After submitting his grievances regarding the replacement chair, Wallace fell out of his wheelchair and sprained his ankle. Wallace contends that he fell because of the lack of foot supports. Whether Wallace's replacement wheelchair was a reasonable accommodation is a disputed issue of fact, and Wallace's fall and injury are further evidence that the accommodation was not reasonable.

The evidence also creates a dispute of material fact over whether WCJ acted with "deliberate indifference." *Updike*, 870 F.3d at 950. First, regarding notice, Wallace alerted the

public entity to his need for accommodation through two grievances and appeals after his new wheelchair was replaced with an old one, even clarifying why his January 20 grievance was not a duplicate. WCJ argues that it was not on notice because staff's response to the January 20 grievance instructed Wallace to submit a medical request form to initiate a wheelchair exchange, which Wallace did not do. At a minimum, however, whether WCJ was on notice of Wallace's need for accommodation after January 20, 2019, is a question of fact.

Second, the Court considers whether WCJ's failure to act resulted from conduct that is more than negligent. The evidence suggests that WCJ did not investigate the request for accommodation after providing the replacement wheelchair. "A denial of a request without investigation is sufficient to survive summary judgment on the question of deliberate indifference." *Id.* at 954. Rather than looking into Wallace's new grievances, WCJ treated Wallace's January grievances as duplicates of the October grievance, ignoring the fact that Wallace no longer had access to the previously provided accommodation of the new wheelchair with foot supports, and denied them without inquiry. Viewing the evidence in the light most favorable to Wallace, WCJ's failure to accommodate or even investigate Wallace's requests in January 2019, despite Wallace's multiple appeals and explanations, suggests deliberateness beyond mere negligence.

In addition, that WCJ rejected Wallace's January grievances multiple times through multiple staff persons suggests WCJ's actions cannot be attributable to "bureaucratic slippage," as might have occurred in a single rejection. *See Duvall*, 260 F.3d at 1138-39. WCJ responds that it performed many investigations into Wallace's requested accommodations in 2018, including speaking with Wallace's orthopedic physician and physical therapist and acting on their advice. These earlier investigations, however, do not address the needs Wallace raised in the

January 2019 grievances that preceded his fall, and it does not appear from the evidence presented that any investigation occurred in January 2019. Thus, there are sufficient disputes of material facts to deny summary judgment for this count.

### b. Count Two: Shower Facilities

Wallace raises two issues with his accessible shower access: first, WCJ's failure to provide an accessible shower when he first arrived at WCJ, and second, WCJ's failure to fix the nonfunctional accessible showers for four months.

### i. Lack of Accessible Shower in August 2018

Wallace had no access to an accessible shower between August 5, 2018, when he arrived at WCJ, and about August 29, 2019, when he was moved to an accessible cell. WCJ provided Wallace with a shower seat during that time, but Wallace's first shower grievance raised concerns that this accommodation did not resolve his accessibility needs. WCJ argues that Wallace was accommodated as he requested after he moved to a cell with an accessible shower. But WCJ does not address the first month during which Wallace had no access to an accessible shower. There is a genuine issue of fact as to whether WCJ failed to make reasonable accommodations for Wallace's disability by failing to timely provide a fully accessible shower during this first month.

There is also a genuine issue of fact on deliberate indifference. WCJ was on notice of Wallace's need for accommodation because they gave him a wheelchair when he arrived at the facility. WCJ does not explain why Wallace also was not given an ADA accessible cell with a shower. On the deliberateness element, Wallace argues that WCJ's delay is attributable not to negligence or bureaucratic slippage, but to staff believing that Wallace had no need for a wheelchair. Wallace points to evidence that WCJ staff disputed his need for a wheelchair when he arrived at WCJ and waited for housing. There is at least a question of fact on this issue.

### ii.  Shower Maintenance Issues

On the second issue, the record shows that WCJ staff evaluated Wallace's complaints and attempted to accommodate his concerns regarding shower functionality. WCJ staff investigated Wallace's initial October 2018 grievance: they followed up with maintenance and tried the showers to determine that water was flowing in Wallace's shower. Wallace's grievance appeal admits that the showers worked at least part of the time. *See, e.g.*, Grievances Ex. at 27 ("Last night I attempted to shower and the water indeed flowed for about 3 minute[s] . . . on average am lucky to get a shower once a week."). After staff verified functionality issues, they worked to accommodate Wallace by moving him to another cell. Then, even though staff personally witnessed water flowing in Wallace's shower, staff submitted maintenance requests to ensure the issue was corrected. Although WCJ staff never responded to Wallace's final appeal of his October 31st grievance, this fact alone does amount to deliberate indifference. Even drawing all reasonable inferences in Wallace's favor, the Court finds no evidence to suggest that WCJ staff believed Wallace's shower issue remained unresolved.

Additionally, when Wallace's issues persisted after maintenance completed their work on December 20, 2018, a WCJ staff member repeatedly took Wallace to shower in another location. That Wallace managed to shower several times does not *bar* his ADA claim. *See, e.g.*, *Schmidt v. Odell*, 1999 WL 640041, at *19 (D. Kan. July 7, 1999) ("The fact that plaintiff was actually able to use most of the jail services does not preclude his claim in light of the fact he was able to do so only by virtue of exceptional and painful exertion which was contrary to a physician's instructions concerning his disability."). But this staff member's efforts, in addition to WCJ's investigations, work orders, and other temporary accommodations, indicate that WCJ was not deliberately indifferent to Wallace's need for accommodation on his broken shower. Maintenance's initial failure to uncover the faulty valve behind Wallace's shower at most bears

signs of negligence, but not the element of deliberateness required to show intentional discrimination. The record taken as a whole could not lead a rational trier of fact to find for Wallace on this issue. The Court therefore grants partial summary judgment as to shower maintenance but denies summary judgment on Wallace's initial access to a shower.

### c.  Count Three: Transport

Wallace claims that WCJ failed to secure transportation that accommodated his disability when WCJ transported Wallace to a court appearance shackled around his waist and feet and placed on the floor of a van. WCJ does not dispute that Wallace was transported this way, which it calls a "transport error." WCJ instead argues that Wallace cannot show that its accommodation was unreasonable because WCJ considered and accommodated Wallace's requests after he grieved this incident. WCJ thus seeks to start the clock *after* Wallace grieved the "transport error" and WCJ worked to ensure that it would not happen again. Also, according to WCJ, the "transport error" was a matter of bureaucratic slippage and merely an imperfection in responding to Wallace's accommodation needs.

The Court declines to start the clock after Wallace's grievance and looks instead to the entire period during which Wallace, who is disabled, was under the control of WCJ. At the minimum, there is a question of fact as to whether Wallace's van transport was reasonable. As the Court stated in its ruling on the motion to dismiss, it is not plausible to suggest there are no reasonable methods of transporting an individual requiring a wheelchair other than shackled and placed on the floor of a van. *Wallace v. Washington Cnty. Jail*, 2019 WL 2583487, at *4 (D. Or. June 24, 2019).

Second, there also is a dispute of material fact on the issue of deliberate indifference. When a plaintiff's need for accommodation is obvious, the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the knowledge element of the

deliberate indifference test. *Updike*, 870 F.3d at 951. WCJ knew of Wallace's need for accommodation before the "transport error." In fact, WCJ acknowledged Wallace's mobility limitations by giving him a wheelchair when he first arrived at the facility.

To meet the second prong, WCJ's failure to act must result from conduct that is more than negligent and involves an element of deliberateness. *Id.* Despite Wallace's visible need for accommodation, WCJ staff shackled Wallace at the waist, restrained his limbs, and placed him on the floor of the van without further restraints that could prevent Wallace from sliding across the floor. This act alone could allow a jury to find more than mere negligence. Wallace also contends that WCJ staff intentionally drove in a manner that caused Wallace to slide around the floor of the van. According to Wallace, WCJ's method of transport resulted in Wallace nearly hitting his head on a metal bench and exacerbating his preexisting neck and shoulder pain. Finally, WCJ's response to the difficulties Wallace experienced on the way to the courthouse was to repeat the "transport error" on the way back to WCJ. Even if it is conceivable that WCJ was not on notice of Wallace's need for alternative transport on the way to the courthouse, it almost certainly was on notice during the return trip. Thus, there is a question of material fact on WCJ's indifference to this transport condition.

WCJ took corrective steps after Wallace grieved the "transport error." But after-the-fact actions would not resolve whether WCJ was deliberately indifferent to Wallace's initial need for safe transport to and from the courthouse. Similarly, the fact that WCJ may have excusably erred in dispensing "proper communications and hazards" to its staff does not explain WCJ's initial failure to accommodate Wallace's disability during the August 10, 2018 court transport.

WCJ relies on *Updike* in characterizing this incident as "bureaucratic slippage." 870 F.3d at 952. But *Updike* is not persuasive here. In *Updike*, due to "an absence of effective

communication and coordination" between a county's Pretrial Release Office and the Oregon

Judicial Department (OJD), OJD staff did not know that the plaintiff required an ASL interpreter

at his arraignment and did not order one for him. 870 F.3d at 951-52 (holding that there was no

deliberate indifference because of bureaucratic slippage). Wallace was visibly using a wheelchair

as he waited for transport to the courthouse, belying any argument that transport staff had no idea

that Wallace required some accommodation. Wallace thus provided sufficient evidence to create

an issue of fact as to whether WCJ was deliberately indifferent to providing Wallace with

suitable transport. The Court denies WCJ's motion as to this count.

In sum, WCJ's alleged failure to provide an appropriate wheelchair, accessible shower,

and proper transport raise questions of disputed fact on the "reasonableness" of WCJ's

accommodation, as well as WCJ's deliberate indifference to Wallace's needs. The Court denies

summary judgment on the first three counts as narrowed above.

## B.  Arguments on Count Four

### 1.  Standards for Administrative Exhaustion under the PLRA

The PLRA requires an inmate to exhaust all available administrative remedies before

filing a federal action to redress prison conditions or incidents:

> No action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner
> confined in any jail, prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion is mandatory and requires compliance with both procedural

and substantive elements of the prison administrative process. *Woodford v. Ngo*, 548 U.S. 81, 85,

90 (2006); *McKinney v. Carey*, 311 F.3d 1198, 1199-1200 (9th Cir. 2002) (per curiam). Even so,

exhaustion is mandatory only if "administrative remedies . . . are available." *Ross v. Blake*, 578

U.S. 632, 648 (2016). "To be available, a remedy must be available as a practical matter; it must be capable of use; at hand." *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014) (cleaned up).

Failure to exhaust under the PLRA is "an affirmative defense the defendant must plead and prove." *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007). Further, the PLRA exhaustion requirement is not jurisdictional and thus does not delineate the adjudicatory authority of the Court. *Woodford*, 548 U.S. at 101. The defendant has the initial burden to prove that "there was an available administrative remedy, and that the [inmate] did not exhaust that available remedy." *Albino*, 747 F.3d at 1172. If the defendant can establish the plaintiff's failure to exhaust, the burden shifts to the plaintiff to "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.*; *see Ross*, 578 U.S. at 643-44 (defining unavailability).

## 2. Analysis—Exhaustion

In his final ADA claim, his fourth count, Wallace alleges that WCJ fired Wallace because of Wallace's inability to perform work assignments that involved climbing stairs. WCJ argues that this claim is barred by PLRA for failure to exhaust administrative remedies. Wallace contends that he satisfied exhaustion requirements, or that WCJ's failure to respond to Wallace's third appeal of the relevant grievance should not bar this claim.

An inmate does not fail to exhaust if administrative remedies are unavailable. *Ross*, 578 U.S. at 643. The question here is whether a prison's failure to *respond* to a grievance renders the remedy unavailable. The Ninth Circuit has noted that "[e]very circuit to have considered the issue has agreed that a prison's failure to respond renders an administrative remedy unavailable." *Fordley v. Lizarraga*, 18 F.4th 344, 355 & n.8 (9th Cir. 2021) (citing, *e.g.*, *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019) ("[W]e hold that as soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies,

it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement."); *Boyd v. Corr. Corp. of Am.*, 380 F.3d 989, 996 (6th Cir. 2004) (holding that "administrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance")). But the Ninth Circuit in *Fordley* also made clear that this circuit has not adopted "a bright-line rule that *any* delay in a prison's response to an inmate's grievance is sufficient to render administrative remedies unavailable." 18 F.4th at 358. Instead, the Ninth Circuit considers the specific circumstances rendering the administrative remedies unavailable. *See id.* at 351-52; *id.* at 358.

In *Fordley*, the Ninth Circuit "held that a prison's failure to respond to an emergency grievance over the course of several months, and in contravention of its own deadlines, rendered administrative remedies unavailable." *Eaton v. Blewett*, 50 F.4th 1240, 1245 (9th Cir. 2022).[6] Thus, "[d]elays in processing and failures to respond to pending grievances are circumstances signaling the practical unavailability of administrative remedies." *Id.* at 1246.

WCJ's grievance reporting system identifies that Wallace appealed the second level denial of his grievance eleven days before his transfer to another facility.[7] WCJ did not respond,

---

[6] The dissent in *Fordley* described the majority's holding as "essentially adopt[ing] the reasoning of the Third Circuit in *Shifflett v. Korszniak* that it is unfair to require a prisoner to exhaust available remedies if prison officials have not strictly complied with their own regulations." 18 F.4th at 366 (Bade, J., dissenting) (citing *Shifflett*, 934 F.3d at 367 ("The PLRA requires strict compliance by prisoners seeking redress of their grievances, and by the same token we hold that it requires strict compliance by prison officials with their own policies.")). This description, and the interpretation of *Fordley* in *Eaton*, 50 F.4th at 1245, emphasize the importance of a prison's internal deadlines when considering whether the prison made administrative remedies unavailable.

[7] WCJ argues that Wallace failed to exhaust this grievance because the second level denial found that Wallace had not followed grievance procedures and noted that the grievance was "administratively closed but is not exhausted." WCJ offers no evidence that Wallace could not correct any procedural defects through his appeals on the same grievance. Drawing all reasonable inferences in Wallace's favor, the Court concludes that correcting such defects is possible. The Court also notes that Wallace's appeal appears to address some of the procedural

and the grievance remained open. Wallace also could not reply. WCJ had set a "facility

deadline" on the grievance of February 23, 2019, five days before Wallace's transfer. Despite the

opportunity to do so, WCJ did not follow its own facility deadline to respond to Wallace's

grievance appeal. Wallace sufficiently demonstrates that the circumstances of this case made

administrative remedies practically unavailable to him. The Court thus denies summary

judgment on exhaustion grounds. *See Eaton*, 50 F.4th at 1247 ("We have explained that to

withstand summary judgment a plaintiff must point to specific circumstances in the case that

made administrative remedies practically unavailable.").

### 3. Analysis—Reasonable Accommodation

Regardless of exhaustion issues, WCJ also argues that Wallace cannot show that WCJ

failed to provide a reasonable accommodation. WCJ granted Wallace's request to be placed on a

work crew after he first grieved the issue. Wallace does not contest that he was granted a

reasonable accommodation to join a work pod with limited work duties. There is a material

factual dispute, however, about whether WCJ adhered to its accommodation when assigning

work duties to Wallace, including whether WCJ staff ordered Wallace to work in an upstairs area

of the pod that he could not access. In an internal note, Deputy Sanchez appears to acknowledge

the stairs assignment: "[Wallace] did not have to *only* go upstairs." Grievances Ex. at 53

(emphasis added). There is also a question of fact on deliberate indifference regarding whether

WCJ, which had notice, as shown by its initially granting Wallace work accommodations,

---

concerns listed in the second level denial of his grievance, and his appeal may have permitted his
grievance to achieve consideration on the merits. The Court also finds that "closed but not
exhausted" refers to a grievance that has not achieved four levels of consideration, as did
Wallace's uncontested grievance exhaustions. At the very least, there are questions of fact
remaining on the grievance procedures.

exhibited more than mere negligence in directing Wallace to perform assignments in inaccessible areas and then terminating his work position. The Court denies summary judgment on this count.

## CONCLUSION

The Court DENIES Washington County Jail's Motion for Summary Judgment. ECF 99. Wallace's ADA claim against the Jail may proceed as narrowed in this Order. Based on Wallace's voluntary withdrawal with prejudice of his claim against NaphCare Medical, the Court DISMISSES WITH PREJUDICE Wallace's claim against NaphCare and DENIES AS MOOT NaphCare's Motion for Summary Judgment. ECF 101.

**IT IS SO ORDERED**.

DATED this 25th day of July, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge